FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 18 2024

TAMMY H. DOWNS, CLERK
By: _____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

ROBERT KEITH HILL;
JANICE HILL; and JESSICA
GRAHAM AS TRUSTEE OF THE
ROBERT KEITH AND JANICE HILL
REVOCABLE TRUST                                         **PLAINTIFFS**

vs.                          CASE NO. 3:24cv-00162-DPM

DANIEL LAULETTA; DOUGLAS "JEB"
STEPHEN; SKYLIGHT FINANCIAL
GROUP, LLC; SKYLIGHT FINANCIAL       This case assigned to District Judge Marshall
GROUP II, LLC; LIGHTHOUSE WEALTH     and to Magistrate Judge Volpe
SOLUTIONS, LLC; MASSACHUSETTS
MUTUAL LIFE INSURANCE COMPANY; and
MML INVESTORS SERVICES, LLC                             **DEFENDANTS**

## COMPLAINT

Robert Keith Hill ("Mr. Hill"); Janice Hill ("Mrs. Hill," and, with Mr. Hill, the "Hills"); and Jessica Graham as Trustee of the Robert Keith and Janice Hill Revocable Trust ("Trust" and, with the Hills, the "Plaintiffs") by and through their attorneys, Friday Eldredge, & Clark, LLP, submit this Complaint against Daniel Lauletta ("Lauletta"); Douglas "Jeb" Stephen ("Stephen"); Skylight Financial Group, LLC and Skylight Financial Group II, LLC, and Lighthouse Wealth Solutions, LLC ("Skylight"); Massachusetts Mutual Life Insurance Company ("MassMutual"); and MML Investor Services, LLC ("MMLI").

### I. PARTIES, JURISDICTION, & VENUE

1. The Hills are individual residents and citizens of Arkansas.

2. Jessica Graham is an individual resident of Arkansas, and the Trust is created under

1

and governed by the laws of Arkansas.

3. On information and belief, Lauletta is an individual resident of Ohio. Lauletta is an investment adviser who was registered with the Arkansas Securities Department and the Securities and Exchange Commission until approximately 2022. He was an investment adviser as defined by Arkansas Code Annotated § 23-42-102(9) and 15 U.S.C § 80b-2(a)(11), at all times relevant to his actions described in the Complaint.

4. On information and belief, Stephen is an individual resident of Ohio. Stephen is an investment adviser who is registered with the Securities and Exchange Commission. Stephen worked in conjunction with Lauletta until approximately 2022, at which time, Lauletta left Skylight, and Stephen continued to service Lauletta's clients. At all times relevant to the Complaint, he was an investment adviser as defined by 15 U.S.C § 80b-2(a)(11).

5. Skylight Financial Group, LLC and Skylight Financial Group II, LLC, and Lighthouse Wealth Solutions, LLC are Ohio limited liability companies with their principal places of business in Cleveland, Ohio.

6. MassMutual is a Massachusetts insurance company with its principal place of business in Springfield, Massachusetts. MassMutual is an Arkansas licensed insurer according to the Arkansas Insurance Department's website.

7. MML Investors Services, LLC, is a Massachusetts limited liability company with its principal place of business in Springfield, Massachusetts. On information and belief, MMLI is a MassMutual subsidiary company responsible for its insurance business, and is party to a Producer Agreement dated September 2, 2016, through which Lauletta was authorized to sell insurance policies that are approved for MMLI distribution, including the Policy (defined below) to the Hills.

8. Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1332.

9. There is diversity jurisdiction based on the diversity of citizenship of the parties with an amount in controversy exceeding $75,000.

10. Venue is proper in this District under 28 U.S.C. § 1391, *et seq.*, because the Individual Defendants actively participated in a scheme to enrich themselves to Plaintiffs' detriment, and the primary effects of Defendants' conduct manifested in Arkansas.

## II. FACTUAL BACKGROUND

11. Mr. Hill is a practicing pharmacist in Rector, Arkansas. He has been a pharmacist for several decades and owns his own pharmacy in Clay County, Arkansas.

12. Lauletta was a financial planner and was registered as an investment advisor with the Arkansas Securities Department and the Securities and Exchange Commission until approximately 2022.

13. Mr. Hill met Lauletta in approximately 2015 and Lauletta began advising the Hills on retirement planning at that time.

14. In 2015, Lauletta was selling Pacific Life insurance policies.

15. Also in 2015, Lauletta sold the Hills an almost $8 million Pacific Life insurance policy. Lauletta told the Hills this would help address estate taxes – despite the fact that at that time, the Hills' estate was unlikely to be subject to estate taxes.

16. Because the Hills could not afford to pay the annual life insurance premiums, Lauletta advised the Hills to finance the policy. The policy was owned by the Trust, and therefore, the Trust, also at Lauletta's direction, entered into a premium financing arrangement, and the Hills personally guaranteed this debt.

17. Following Lauletta's advice, the Hills borrowed $1,000,000 to pay the 2015 premium, an additional $439,077 to pay the 2016 premium, and an additional $439,077 to pay the

3

2017 premium.

18. By 2018, Lauletta had moved to Skylight, where he continued to work as a financial planner and had started writing policies for MassMutual. He continued to sell various life insurance policies and annuities to Arkansans. Lauletta worked in this capacity until approximately 2022.

19. Skylight offers "[s]ecurities, investment advisory, and financial planning services… through qualified registered representatives of MML[I]." *See* https://skylightfinancialgroup.com/.

20. MMLI's website recognizes its status as a subsidiary of MassMutual and touts itself as "a leading independent broker-dealer and registered investment adviser" "committed to helping you achieve your financial goals." *See* https://www.massmutual.com/investment/mmlinvestors.

21. During his time with Skylight, Lauletta was listed on Skylight's website as part of the Skylight team. The website recognized Lauletta's affiliation with MassMutual, noting that he sat on MassMutual's Financial Planning Committee and that he was a member of MassMutual's Society 1851, which recognizes career performance. The website stated: "Philanthropic planning, inter-generational wealth transfer, long-term financial planning, and helping his clients map out the future they want to live is Dan's passion, profession, and gift."

22. On information and belief, Lauletta and his MassMutual team, Jeb Stephen, Brent Affolter, and Sean McCoy, earned commissions or other compensations for selling MassMutual policies, and so do Skylight and MMLI. Obviously, MassMutual benefits from such an arrangement because it receives premium payments.

23. So, in 2018, Lauletta and his team went back to the Hills and convinced the Hills to replace the Pacific Life insurance policy previously sold to them by Lauletta with a new MassMutual Policy.

24. To replace the Pacific Life insurance policy, Lauletta convinced the Hills to assign the Pacific Life insurance policy to MassMutual, which was believed to have a cash surrender value of at least $1,165,387.00. Upon information and belief, MassMutual accepted the assignment, the cash value of the Pacific Life insurance policy was transferred into the new MassMutual policy, and at the same time, Wintrust agreed to finance any remaining premium due on the new MassMutual policy.

25. At the same time, Lauletta and his team suggested to the Hills that they needed <u>more</u> life insurance.

26. The MassMutual insurance policy application suggests an amount of $13,173,127. Ultimately, the new policy ("Policy") had a death benefit of $11,330,070, which is a 55% increase from the Pacific Life death benefit of $7,290,243.

27. The MassMutual insurance policy application, which listed Lauletta as the soliciting producer, and listed Brent Affolter, Douglas Stephen (aka Jeb Stephen), and Sean McCoy as additional producers, stated that the Hills' net worth was $30,000,000. The application further stated that the Hills' earned (gross) income was $400,000 per year, with an additional $100,000 of unearned income per year. The application lists no assets or debts.

28. At the time, aside from the pharmacy, the Hills owned farmland that was financed.

29. Lauletta and his team knew that the Hills' net worth was nowhere near $30,000,000, yet they proceeded with the application anyway.

30. Then they again advised the Hills to finance the policy. This policy was owned by the Trust, and therefore, the Trust, also at Lauletta's direction, entered into a premium financing arrangement, and the Hills personally guaranteed this debt.

31. Premium financing requires the owner of the policy to borrow money to pay the

policy's premiums and to repay the lender through regular payments, which include interest payments.

32. This policy, and the premium financing arrangement, was and is totally unsuitable for the Hills. Mr. Lauletta and his team knew that it was unsuitable and recommended it anyway so that he and his team could collect exorbitant commissions without regard or concern for the financial impact it would have on the Hill family.

33. To make matters worse, Mr. Hill was 69 years old when Lauletta sold the Hills the MassMutual policy. Lauletta must have known that Mr. Hill would retire in the near future, which would significantly impact the Hills' annual net income, and their ability to service the debt for such a significant policy, given that their primary income source was Mr. Hill's income as a pharmacist.

34. Lauletta convinced the Hills that this policy would "pay for itself" and that it was needed if Mr. Hill didn't want his family to be forced to sell assets at his death to pay estate taxes, despite the fact that at that time, the Hills' estate was unlikely to be subject to estate taxes.

35. The estate tax exemption per person in 2018 was $11,200,000, or $22,400,000 for the Hills collectively. Therefore, the Hills' combined *net* worth had to exceed $22,400,000 before any estate tax would be due (it didn't).

36. Such a policy was therefore wholly unnecessary for estate tax planning; nonetheless, Lauletta and his team advised the Hills to purchase this policy.

37. To pay the 2019 premium, the Hills had to borrow $810,150. To pay the 2020 premium (plus interest) the Hills had to borrow $972,092 ($810,150 premium + $161,942 interest).

38. To pay the 2021 premium (plus interest) the Hills had to borrow $968,994 ($810,150 premium + $158,844 interest).

6

39. To pay the 2022 premium (plus interest) the Hills had to borrow $937,853 ($810,150 premium + $127,703 interest).

40. To pay the 2023 premium, the Hills had to borrow $966,000 ($810,150 premium + $155,850 interest, with a rate increase to 6.15%).

41. In 2023, Stephen informed the Hills that the interest cap for 2024 would be 6.89%, and that after next year's renewal, "the entire loan will need to be restructured as the original term of the loan will expire."

42. To pay the premium (plus interest) for 2024, the Hills had to borrow $909,237 ($810,150 premium + $99,087 interest).

43. Again, this premium financing arrangement required the Trust and the Hills to personally guarantee the debt to Wintrust, which has now amounted to $9,257,797.09.

44. The Hills had to increase their letter of credit by $567,603.96 in February 2024 to secure the Wintrust loan, for a total line of credit of $3,798,084.

45. The Wintrust premium financing arrangement for the MassMutual policy requires the Hills to obtain and secure additional collateral each year, or surrender the policies, which the Hills have done each year following the advice of Lauletta and Stephen, despite the fact that the policies were unnecessary for their purported purpose.

46. The Hills borrowed this money to finance their life insurance premiums on the advice of Lauletta and his team, including Stephen, who were acting as agents of Skylight and MMLI, and who knew that this life insurance policy was unnecessary and financially prohibitive for the Hills. Despite this, Lauletta and his team advised and urged Mr. Hill to apply for the policy so that Defendants would reap the financial benefits of these transactions. This kind of knowingly bad advice, which is on brand for Lauletta, is well below the standard of care for similar

professionals.

47. Lauletta and his team did not stop with just the life insurance policies. They also advised the Hills to obtain at least six variable index annuities with long surrender times and high annual fees.

48. Upon information and belief, Lauletta and his team advised the Hills to obtain these annuities with funds that had previously been invested in the Hills IRA, which was not prudent.

49. Also upon information and belief, Lauletta and his team advised the Hills to make substantial, unnecessary, and imprudent withdrawals from at least one of these annuities.

50. Lauletta and his team knew that these types of annuities were not prudent and advised the Hills to obtain them anyway. On information and belief, Lauletta, Stephen, their team, Skylight, and/or MMLI received significant commissions in connection with such annuities.

51. Upon information and belief, Lauletta and his teams' investment and insurance recommendations were designed to maximize commissions received by Defendants at the Hills' expense.

52. This conduct, known as life insurance or annuity churning, is well below the applicable standard of care for investment advisers and investment companies. Lauletta's and Stephen's conduct is imputable to MMLI and Skylight under the doctrine of respondeat superior and related agency principles.

53. The Defendants' advice ultimately generated results that are not suitable for the Hills in light of their actual net worth and inability to pay the premiums of the MassMutual policy or the interest payments on the premium financing of such policies.

54. Defendants' actions were well below the standard of care for investment advisers and investment companies.

55. A prudent advisor would never have recommended this expensive and unnecessary conduct to the Hills. The missed investment opportunities to date, future missed investment opportunities, and the debt for the MassMutual policy premiums for which the Trust (and ultimately the Hills) is a guarantor is immense.

56. On information and belief, on multiple occasions, MassMutual and/or Skylight and/or MMLI internally questioned Lauletta on his selling strategies while continuing to write policies that he sold.

57. From the outset of the Hills' relationship with the Defendants, the Defendants have secretly, furtively, and deceptively acted and conducted themselves in a manner designed to conceal the impropriety of their actions.

58. MassMutual continued to write policies for Lauletta despite knowing that Lauletta, Skylight, and MMLI engaged in deceptive sales tactics. On information and belief, MassMutual has rescinded other policies sold by Lauletta, Skylight, and MMLI before this transaction.

59. Lauletta, Stephen, and their team, as agents of Skylight and MMLI, told the Hills to buy the policy for a fake purpose: to purportedly minimize estate tax consequences, which they knew were not applicable to the Hills at the time the Policy was sold, nor would it be applicable to the Hills today.

60. Ultimately, Defendants effectuated a scheme on the Hills to enrich themselves at the Hills expense. The Hills could not have discovered Defendants' scheme through the exercise of reasonable diligence.

61. Lauletta and Stephen and the Hills were in a confidential relationship as investment adviser and clients, respectively. Lauletta and the Hills' circumstances and relationship were such that Lauletta and Stephen owed a duty to the Hills to tell them about Defendants' scheme.

62. Lauletta and Stephen's duties to the Hills are imputed to MMLI and Skylight, because they were acting in the scope of their employment and agency with MMLI and Skylight when carrying out the above-described activities.

63. MassMutual knew or should have known that Lauletta, Stephen, and therefore MMLI and Skylight, were engaging in unfair, deceptive and/or unsound selling practices. On information and belief, MassMutual had internally expressed reservations about writing policies sold by Lauletta and had even rescinded some.

64. As a life insurer who knows its products are being used for retirement and financial planning purposes, MassMutual owed a duty to its insureds, like the Hills, to tell them about Lauletta's (and therefore MMLI's and Skylight's and Lauletta's teams') history of unfair, deceptive, and/or unsound selling practices.

65. Given the circumstances, the Hills expected that defendants were acting for their benefit. The Hills believed that Lauletta, Stephen, MMLI, and Skylight were prudently and properly advising them on how best to plan for retirement and for a sound financial future. The Hills believed that MassMutual would not underwrite a policy for a producer that it knew was engaging in unfair, deceptive, and/or unsound selling practices that resulted in the sale of policies that were not in the insureds' best interests.

66. Of course, Defendants did not tell the Hills any of this. Instead, Defendants kept making money at the Hills expense.

### III. CAUSES OF ACTION

#### COUNT I: NEGLIGENCE (LAULETTA & STEPHEN)

67. The Hills adopt and fully incorporate the paragraphs above as set forth herein word for word.

68. Lauletta and Stephen owed certain duties to Plaintiffs, including but not limited to:

   a. Those provided by 15 U.S.C. § 80a-1 *et seq.*;

   b. Those provided by 15 U.S.C. § 80b-1 *et seq.*;

   c. Those provided by Arkansas Code Annotated § 23-42-101 *et seq.*;

   d. Those provided by the regulations of the Arkansas Securities Commissioner and the Arkansas Insurance Department;

   e. The duty to act in Plaintiffs' best interests;

   f. The duty to exercise the degree of skill and care ordinarily possessed and used by other investment advisers and insurance agents doing similar work.

69. Lauletta and Stephen breached each of these duties as explained herein.

70. Lauletta's and Stephen's breaches of these duties directly and proximately damaged Plaintiffs in an amount to be determined at trial but in no event less than the amount required for federal diversity jurisdiction.

71. Additionally, Lauletta's and Stephen's negligence and liability may be imputed to Skylight and MMLI as he was acting in the scope of his employment and agency with the same.

**COUNT II: BREACH OF FIDUCIARY DUTIES (LAULETTA & STEPHEN)**

72. The Hills adopt and fully incorporate the paragraphs above as set forth herein word for word.

73. A fiduciary relationship exists between an investment adviser and a client.

74. Lauletta and Stephen's owed certain fiduciary duties to Plaintiffs, including but not limited to:

   a. Those provided by 15 U.S.C. § 80a-1 *et seq.*;

   b. Those provided by 15 U.S.C. § 80b-1 *et seq.*;

11

  c. Those provided by Arkansas Code Annotated § 23-42-101 *et seq.*;

  d. Those provided by the regulations of the Arkansas Securities Commissioner and the Arkansas Insurance Department;

  e. The duty to act in Plaintiffs' best interests;

  f. The duty not to self-deal.

75. Lauletta and Stephen's breached each of these duties as explained herein.

76. Lauletta's and Stephen's breaches of these duties directly and proximately damaged Plaintiffs in an amount to be determined at trial but in no event less than the amount required for federal diversity jurisdiction.

77. Additionally, Lauletta's and Stephen's breach of duty and liability may be imputed to Skylight and MMLI as he was acting in the scope of his employment and agency with the same.

## COUNT III: CIVIL CONSPIRACY

78. The Hills adopt and fully incorporate the paragraphs above as set forth herein word for word.

79. Defendants entered into an agreement to accomplish a purpose that is unlawful or oppressive or to accomplish, by unlawful or oppressive means, a purpose that is not in itself unlawful or oppressive (the "Conspiracy").

80. Because of the Conspiracy, the allegations against Lauletta and Stephen are herein adopted against the remaining Defendants. As alleged above, each Defendant took at least one or more overt acts in furtherance of the Conspiracy.

81. MassMutual continued to write policies for Lauletta after learning about his deceptive sales tactics. Defendants created a system whereby Lauletta, with the help of his team, working for Skylight and as an agent of MMLI, intentionally pitched premium-financed

MassMutual policies that were not necessary or suitable for the Hills' financial planning needs.

82. As a result of such system, Lauletta advised the Hills to purchase the Policy, then advised him to finance it through Wintrust.

83. As a result of such system, Lauletta advised the Hills, and their Trust, to personally guarantee the debt to Wintrust.

84. Lauletta advised Plaintiffs to do all these things despite the fact that the Policy was not necessary or suitable for the Hills' financial planning needs. Instead, Lauletta advised the Hills to do so in furtherance of the conspiracy among the Defendants and so that the Defendants would profit therefrom.

85. As alleged in this Complaint, Defendants each committed one or more overt acts in furtherance of the Conspiracy, and they had the specific intent to harm Plaintiffs, and particularly Mr. Hill.

86. Further, following numerous complaints and inappropriate actions like those described herein taken by Lauletta against other Arkansans, Lauletta lost the ability to maintain his registration as a financial adviser in Arkansas in 2022. Instead of using this as an opportunity to address these bad policies written by Lauletta, Defendants allowed Lauletta's team, and particularly Stephen, to continue the scheme against unknowing victims, including the Hills, thus perpetuating and continuing the conspiracy.

87. As a result of the Conspiracy, Plaintiffs proximately have suffered damages in an amount to be determined at trial but in no event less than the amount required for federal diversity jurisdiction, litigation costs, and attorney's fees.

88. Additionally, Defendants knew or should have known that, in carrying out such Conspiracy, it would naturally and probably result in damage to Plaintiffs and/or in reckless

disregard of the consequence to the extent that malice may be inferred from Defendants' conduct.

89. Therefore, in addition to all other damages to which Plaintiffs are entitled to recover from Defendants, Plaintiffs are entitled to recover punitive damages from Defendants in an amount to be established at trial but in no event less than the amount required for federal diversity jurisdiction.

### COUNT IV: NEGLIGENT HIRING AND SUPERVISION OF LAULETTA
### (SKYLIGHT, MMLI, & MASSMUTUAL)

90. The Hills adopt and fully incorporate the paragraphs above as set forth herein word for word.

91. Lauletta was an employee or independent contractor of Skylight, MMLI, and MassMutual.

92. Lauletta was careless, reckless, and incompetent in the performance of his duties to the Hills on behalf of Skylight, MMLI, and MassMutual, as herinabove alleged.

93. Lauletta was also careless, reckless, and incompetent prior to his relationship with Skylight, MMLI, and MassMutual, as evidenced by the numerous complaints received from customers about Lauletta.

94. Skylight, MMLI, and MassMutual knew (or should have known) of Lauletta's carelessness, recklessness, and incompetence as evidenced by the heightened supervision measures they mandated as a condition of his employment. They certainly knew (or should have known) of the pending customer complaints. Skylight, MMLI, and MassMutual negligently selected and hired Lauletta anyway.

95. Skylight, MMLI, and MassMutual undertook to perform certain supervision efforts as evidenced by the heightened supervision measures they mandated as a condition of his employment.

96. Skylight, MMLI, and MassMutual negligently performed their supervisory duties; the best evidence of this is what is happening to the Hills, and what has happened to other MassMutual policy holders who bought their policy (and premium financed such purchase) on Lauletta's advice.

97. Skylight, MMLI, and MassMutual's negligent selection and supervision of Lauletta proximately caused the Hills' damages in an amount to be determined at trial but in no event less than the amount required for federal diversity jurisdiction, litigation costs, and attorneys' fees.

98. Plaintiffs request a jury trial on all issues so triable.

WHEREFORE, Plaintiffs pray for a judgment against Defendants jointly and severally for negligence, breach of fiduciary duty, conspiracy, negligent supervision, and negligent hiring, each in an amount to be assessed by a jury, but in no event less than the amount required for federal diversity jurisdiction, plus punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and any other relief to which they may be entitled.

Respectfully submitted,

*/s/ Kael K. Bowling*

Kael K. Bowling, Ark. Bar No. 2016220
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, Arkansas 72758
Telephone: (479) 695-2118
Facsimile: (501) 244-5333
kbowling@fridayfirm.com