**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**ROBERT KEITH HILL;
JANICE HILL; and JESSICA
GRAHAM AS TRUSTEE OF THE
ROBERT KEITH AND JANICE HILL
REVOCABLE TRUST**                                           **PLAINTIFFS**

vs.                     **CASE NO. 3:24-cv-00162-DPM**

**DANIEL LAULETTA; DOUGLAS "JEB"
STEPHEN; SKYLIGHT FINANCIAL
GROUP, LLC; SKYLIGHT FINANCIAL
GROUP II, LLC; LIGHTHOUSE WEALTH
SOLUTIONS, LLC; and MASSACHUSETTS
MUTUAL LIFE INSURANCE COMPANY**             **DEFENDANTS**

**FIRST AMENDED COMPLAINT**

Robert Keith Hill ("Mr. Hill"); Janice Hill ("Mrs. Hill," and, with Mr. Hill, the "Hills"); and Jessica Graham as Trustee of the Robert Keith and Janice Hill Revocable Trust ("Trust" and, with the Hills, the "Plaintiffs") by and through their attorneys, Friday Eldredge, & Clark, LLP, submit this First Amended Complaint against Daniel Lauletta ("Lauletta"); Douglas "Jeb" Stephen ("Stephen"); Skylight Financial Group, LLC and Skylight Financial Group II, LLC, and Lighthouse Wealth Solutions, LLC ("Skylight"); Massachusetts Mutual Life Insurance Company ("MassMutual"); and MML Investor Services, LLC ("MMLI").

**I. PARTIES, JURISDICTION, & VENUE**

1. The Hills are individual residents and citizens of Arkansas.

2. Jessica Graham is an individual resident of Arkansas, and the Trust is created under and governed by the laws of Arkansas.

3. On information and belief, Lauletta is an individual resident of Ohio. Lauletta is an investment adviser who was registered with the Arkansas Securities Department and the Securities

1

and Exchange Commission until approximately 2022. He was an investment adviser as defined by Arkansas Code Annotated § 23-42-102(9) and 15 U.S.C § 80b-2(a)(11), at all times relevant to his actions described in the Complaint.

4. On information and belief, Stephen is an individual resident of Ohio. Stephen is an investment adviser who is registered with the Securities and Exchange Commission. Stephen worked in conjunction with Lauletta until approximately 2022, at which time, Lauletta left Skylight, and Stephen continued to service Lauletta's clients. At all times relevant to the Complaint, he was an investment adviser as defined by 15 U.S.C § 80b-2(a)(11).

5. Skylight Financial Group, LLC and Skylight Financial Group II, LLC, and Lighthouse Wealth Solutions, LLC are Ohio limited liability companies with their principal places of business in Cleveland, Ohio.

6. MassMutual is a Massachusetts insurance company with its principal place of business in Springfield, Massachusetts. MassMutual is an Arkansas licensed insurer according to the Arkansas Insurance Department's website.

7. MML Investors Services, LLC, is a Massachusetts limited liability company with its principal place of business in Springfield, Massachusetts. On information and belief, MMLI is a MassMutual subsidiary company responsible for its insurance business, and is party to a Producer Agreement dated September 2, 2016, through which Lauletta was authorized to sell insurance policies that are approved for MMLI distribution, including the Policy (defined below) to the Hills.

8. Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1332.

9. There is diversity jurisdiction based on the diversity of citizenship of the parties with an amount in controversy exceeding $75,000.

10. Venue is proper in this District under 28 U.S.C. § 1391, *et seq.,* because the

Individual Defendants actively participated in a scheme to enrich themselves to Plaintiffs' detriment, and the primary effects of Defendants' conduct manifested in Arkansas.

## II. FACTUAL BACKGROUND

11. Mr. Hill is a practicing pharmacist in Rector, Arkansas. He has been a pharmacist for several decades and owns his own pharmacy in Clay County, Arkansas.

12. Lauletta was a financial planner and was registered as an investment advisor with the Arkansas Securities Department and the Securities and Exchange Commission until approximately 2022.

13. Mr. Hill met Lauletta in approximately 2015, when Lauletta was selling Pacific Life insurance policies.

14. Lauletta began advising the Hills on retirement planning at that time.

15. Mr. Hill informed Lauletta that he owned farmland, and he intended to leave that land to his children.

16. Lauletta told Mr. Hill that leaving the farmland to the kids alone was not the best plan, that Mr. Hill should be worried about the estate taxes his kids would have to pay to inherit the farmland, and that no one knew how the estate tax laws would change over time.

17. Using those statements as justification, Lauletta convinced Mr. Hill to purchase an almost $8 million Pacific Life insurance policy.

18. Lauletta told Mr. Hill that the policy was necessary to help Mr. Hill's kids with any estate taxes the farmland may be subject to, despite knowing that at the time that the Hills' estate was unlikely to be subject to estate taxes.

19. According to Lauletta, if Mr. Hill got the policy for the benefit of his family, they would have millions of dollars left after paying any estate taxes owed upon the event of Mr. Hill's

death.

20. To sweeten the deal, Lauletta told Mr. Hill that this policy would "pay for itself" after a single payment, which the Hills made to the tune of approximately $100,000 and financed the rest, following Lauletta's advice.

21. The policy was owned by the Trust, and therefore, the Trust, also at Lauletta's direction, entered into a premium financing arrangement, and the Hills personally guaranteed this debt.

22. Lauletta advised the Hills to finance the policy because he knew the Hills could not afford to pay the annual life insurance premiums.

23. Premium financing requires the owner of the policy to borrow money to pay the policy's premiums and to repay the lender through regular payments, which include interest payments.

24. Following Lauletta's advice, the Hills borrowed $1,000,000 to pay the 2015 premium, an additional $439,077 to pay the 2016 premium, and an additional $439,077 to pay the 2017 premium.

25. By 2018, Lauletta had moved to Skylight, where he continued to work as a financial planner and had started writing policies for MassMutual. He continued to sell various life insurance policies and annuities to Arkansans. Lauletta worked in this capacity until approximately 2022.

26. Skylight offers "[s]ecurities, investment advisory, and financial planning services… through qualified registered representatives of MML[I]." *See* https://skylightfinancialgroup.com/.

27. MMLI's website recognizes its status as a subsidiary of MassMutual and touts itself as "a leading independent broker-dealer and registered investment adviser" "committed to helping

you achieve your financial goals." *See* https://www.massmutual.com/investment/mmlinvestors.

28. During his time with Skylight, Lauletta was listed on Skylight's website as part of the Skylight team. The website recognized Lauletta's affiliation with MassMutual, noting that he sat on MassMutual's Financial Planning Committee and that he was a member of MassMutual's Society 1851, which recognizes career performance. The website stated: "Philanthropic planning, inter-generational wealth transfer, long-term financial planning, and helping his clients map out the future they want to live is Dan's passion, profession, and gift."

29. On information and belief, Lauletta and his MassMutual team, Jeb Stephen, Brent Affolter, and Sean McCoy, earned commissions or other compensations for selling MassMutual policies, and so do Skylight and MMLI. Obviously, MassMutual benefits from such an arrangement because it receives premium payments.

30. So, in 2018, Lauletta and his team went back to the Hills for another bite at the apple.

31. Mr. Hill told Lauletta that he was purchasing more farmland, and Lauletta and his team took that opportunity to tell Mr. Hill that he would need a *larger* policy than the PacLife Policy he already had.

32. Lauletta told Mr. Hill that he would need to go to MassMutual to get this larger policy. He did not tell Mr. Hill that the reason for going to MassMutual rather than back to PacLife was because Mr. Lauletta was now only selling MassMutual policies as a result of him moving firms, from his prior firm to Skylight.

33. Mr. Hill told Lauletta he was not able to pay any further money towards these policies and expressed hesitation in going forward with the MassMutual Policy.

34. Lauletta again told Mr. Hill that the new policy was needed if he did not want his

family to be left owing significant estate taxes related to the farmland upon the event of his death, and again told Mr. Hill the policy would pay for itself.

35. Lauletta further told Mr. Hill that he would not be making any additional commission on the switch. This assurance let Mr. Hill to trust Lauletta's advice and convinced the Hills to move forward with replacing the Pacific Life insurance policy previously sold to them by Lauletta with a new MassMutual Policy.

36. To replace the Pacific Life insurance policy, Lauletta convinced the Hills to assign the Pacific Life insurance policy to MassMutual, which was believed to have a cash surrender value of at least $1,165,387.00. Upon information and belief, MassMutual accepted the assignment, the cash value of the Pacific Life insurance policy was transferred into the new MassMutual policy, and at the same time, Wintrust agreed to finance any remaining premium due on the new MassMutual policy.

37. The MassMutual insurance policy application suggests an amount of $13,173,127. Ultimately, the new policy ("Policy") had a death benefit of $11,330,070, which is a 55% increase from the Pacific Life death benefit of $7,290,243.

38. The MassMutual insurance policy application, which listed Lauletta as the soliciting producer, and listed Brent Affolter, Douglas Stephen (aka Jeb Stephen), and Sean McCoy as additional producers, stated that the Hills' net worth was $30,000,000. The application further stated that the Hills' earned (gross) income was $400,000 per year, with an additional $100,000 of unearned income per year. The application lists no assets or debts.

39. At the time, aside from the pharmacy, the Hills owned farmland that was financed.

40. Lauletta and his team knew that the Hills' net worth was nowhere near $30,000,000, yet they proceeded with the application anyway.

41. To make matters worse, Lauletta and his team provided only the signature page of the application to the Hills, and did not provide the full application for review. In fact, this was a common tactic of Lauletta's—providing the Hills only the signature pages of documents such that the Hills could not review them before signing. Trusting Lauletta, they signed such documents without the benefit of review.

42. Then they again advised the Hills to finance the policy. This policy was owned by the Trust, and therefore, the Trust, also at Lauletta's direction, entered into a premium financing arrangement, and the Hills personally guaranteed this debt.

43. The financing arrangement for the MassMutual policy was even worse than the financing arrangement for the PacLife Policy. Lauletta heard Mr. Hill's concern about paying money toward the policy. To further conceal the unsuitability of the policy, and to prop up the false "pay for itself" structure he pitched to the Hills, Lauletta was able to set the premium financing arrangement up such that interest was deferred—meaning it continued to accrue but that Plaintiffs haven't had to make a single interest payment. Thus, it appeared to Plaintiffs for several years that the policy was "paying for itself" as Lauletta had claimed it would. In reality, the longer the policy exists and is subject to premium financing, the more Plaintiffs end up owing against it, and the more money they will lose as the loan grows significantly overtime.

44. This policy, and the premium financing arrangement, was and is totally unsuitable for the Hills. Mr. Lauletta and his team knew that it was unsuitable and recommended it anyway so that he and his team could collect exorbitant commissions without regard or concern for the financial impact it would have on the Hill family.

45. To make matters worse, Mr. Hill was 69 years old when Lauletta sold the Hills the MassMutual policy. Lauletta must have known that Mr. Hill would retire in the near future, which

would significantly impact the Hills' annual net income, and their ability to service the debt for such a significant policy, given that their primary income source was Mr. Hill's income as a pharmacist.

46. Again, Lauletta convinced the Hills that this policy would "pay for itself" and that it was needed if Mr. Hill didn't want his family to be forced to sell assets at his death to pay estate taxes, despite the fact that at that time, the Hills' estate was unlikely to be subject to estate taxes.

47. The estate tax exemption per person in 2018 was $11,200,000, or $22,400,000 for the Hills collectively. Therefore, the Hills' combined *net* worth had to exceed $22,400,000 before any estate tax would be due (it didn't).

48. Such a policy was therefore wholly unnecessary for estate tax planning; nonetheless, Lauletta and his team advised the Hills to purchase this policy.

49. To pay the 2019 premium, the Hills had to borrow $810,150. To pay the 2020 premium (plus interest) the Hills had to borrow $972,092 ($810,150 premium + $161,942 interest).

50. To pay the 2021 premium (plus interest) the Hills had to borrow $968,994 ($810,150 premium + $158,844 interest).

51. To pay the 2022 premium (plus interest) the Hills had to borrow $937,853 ($810,150 premium + $127,703 interest).

52. To pay the 2023 premium, the Hills had to borrow $966,000 ($810,150 premium + $155,850 interest, with a rate increase to 6.15%).

53. In 2023, Stephen informed the Hills that the interest cap for 2024 would be 6.89%, and that after next year's renewal, "the entire loan will need to be restructured as the original term of the loan will expire."

54. To pay the premium (plus interest) for 2024, the Hills had to borrow $909,237

($810,150 premium + $99,087 interest).

55. Again, this premium financing arrangement required the Trust and the Hills to personally guarantee the debt to Wintrust, which has now amounted to $9,257,797.09.

56. The Hills had to increase their letter of credit by $567,603.96 in February 2024 to secure the Wintrust loan, for a total line of credit of $3,798,084.

57. The Wintrust premium financing arrangement for the MassMutual policy requires the Hills to obtain and secure additional collateral each year, or surrender the policies, which the Hills have done each year following the advice of Lauletta and Stephen, despite the fact that the policies were unnecessary for their purported purpose.

58. At this point, the Hills cannot surrender the policy and come out even remotely unscathed. Even if the Hills were to surrender the policy today, they would still owe over $4 million dollars out of their own pocket to satisfy the loan. Each year the policy and premium financing arrangements remain in place, Plaintiffs' potential liability grows—completely opposite of what Lauletta told them.

59. The Hills borrowed this money to finance their life insurance premiums on the advice of Lauletta and his team, including Stephen, who were acting as agents of Skylight and MMLI, and who knew that this life insurance policy was unnecessary and financially prohibitive for the Hills. Despite this, Lauletta and his team advised and urged Mr. Hill to apply for the policy so that Defendants would reap the financial benefits of these transactions. This kind of knowingly bad advice, which is on brand for Lauletta, is well below the standard of care for similar professionals.

60. Compounded with the other behaviors of Lauletta and his team, like providing only the signature page of documents rather than the entire document, and the financing scheme they

9

set up for the Hills after being told by the Hills that they could not afford the premiums and interest, it is clear that Lauletta and his team preyed upon the Hills for their own financial gain.

61.     Lauletta and his team did not stop with just the life insurance policies. They also advised the Hills to obtain at least six variable index annuities with long surrender times and high annual fees.

62.     Upon information and belief, Lauletta and his team advised the Hills to obtain these annuities with funds that had previously been invested in the Hills IRA, which was not prudent.

63.     Also, upon information and belief, Lauletta and his team advised the Hills to make substantial, unnecessary, and imprudent withdrawals from at least one of these annuities.

64.     Lauletta and his team knew that these types of annuities were not prudent and advised the Hills to obtain them anyway. On information and belief, Lauletta, Stephen, their team, Skylight, and/or MMLI received significant commissions in connection with such annuities.

65.     Upon information and belief, Lauletta and his teams' investment and insurance recommendations were designed to maximize commissions received by Defendants at the Hills' expense.

66.     This conduct, known as life insurance or annuity churning, is well below the applicable standard of care for investment advisers and investment companies. Lauletta's and Stephen's conduct is imputable to MMLI and Skylight under the doctrine of respondeat superior and related agency principles.

67.     The Defendants' advice ultimately generated results that are not suitable for the Hills in light of their actual net worth and inability to pay the premiums of the MassMutual policy or the interest payments on the premium financing of such policies.

68.     Defendants' actions were well below the standard of care for investment advisers

and investment companies.

69. A prudent advisor would never have recommended this expensive and unnecessary conduct to the Hills. The missed investment opportunities to date, future missed investment opportunities, and the debt for the MassMutual policy premiums for which the Trust (and ultimately the Hills) is a guarantor is immense.

70. To get out from under the Policy and financing arrangement now, the Hills would have to surrender the policy *and still pay* over $4,000,000 to cover the loan balance. To even make a dent in the $4,000,000 owed, the Hills would have to sell significant portions of their farmland or pharmacy, if not all of it, which directly contradicts the entire plan Mr. Hill has had from the beginning of his relationship with Lauletta (and the plan Lauletta was allegedly helping Mr. Hill implement).

71. On information and belief, on multiple occasions, MassMutual and/or Skylight and/or MMLI internally questioned Lauletta on his selling strategies while continuing to write policies that he sold.

72. From the outset of the Hills' relationship with the Defendants, the Defendants have secretly, furtively, and deceptively acted and conducted themselves in a manner designed to conceal the impropriety of their actions. For example, at all times prior to this lawsuit's filing, Lauletta and his team at Skylight corresponded directly with Wintrust (Mr. Hill's premium finance lender), Farm Credit (Mr. Hill's personal lender), and MassMutual on behalf of Plaintiffs related to the Policy.

73. MassMutual continued to write policies for Lauletta despite knowing that Lauletta, Skylight, and MMLI engaged in deceptive sales tactics. On information and belief, MassMutual has rescinded other policies sold by Lauletta, Skylight, and MMLI before this transaction.

11

74. Lauletta, Stephen, and their team, as agents of Skylight and MMLI, told the Hills to buy the policy for a fake purpose: to purportedly minimize estate tax consequences, which they knew were not applicable to the Hills at the time the Policy was sold, nor would it be applicable to the Hills today.

75. Ultimately, Defendants effectuated a scheme on the Hills to enrich themselves at the Hills expense. The Hills could not have discovered Defendants' scheme through the exercise of reasonable diligence.

76. The Hills understood that Lauletta and his team were financial advisers with a better understanding of financial planning than lay people like themselves, and therefore trusted Lauletta and his team to provide them with prudent and sound financial advice.

77. Lauletta and Stephen and the Hills were in a confidential relationship as investment adviser and clients, respectively. Lauletta and the Hills' circumstances and relationship were such that Lauletta and Stephen owed a duty to the Hills to tell them about Defendants' scheme.

78. Lauletta and Stephen's duties to the Hills are imputed to MMLI and Skylight, because they were acting in the scope of their employment and agency with MMLI and Skylight when carrying out the above-described activities.

79. MassMutual knew or should have known that Lauletta, Stephen, and therefore MMLI and Skylight, were engaging in unfair, deceptive and/or unsound selling practices. On information and belief, MassMutual had internally expressed reservations about writing policies sold by Lauletta and had even rescinded some.

80. As a life insurer who knows its products are being used for retirement and financial planning purposes, MassMutual owed a duty to its insureds, like the Hills, to tell them about Lauletta's (and therefore MMLI's and Skylight's and Lauletta's teams') history of unfair,

deceptive, and/or unsound selling practices.

81. Given the circumstances, the Hills expected that defendants were acting for their benefit. The Hills believed that Lauletta, Stephen, MMLI, and Skylight were prudently and properly advising them on how best to plan for retirement and for a sound financial future. The Hills believed that MassMutual would not underwrite a policy for a producer that it knew was engaging in unfair, deceptive, and/or unsound selling practices that resulted in the sale of policies that were not in the insureds' best interests.

82. Of course, Defendants did not tell the Hills any of this. Instead, Defendants kept making money at the Hills expense and continued to advise the Hills regarding the Policy and the financing arrangement each year.

83. The Hills began to understand the depths of the situation and the actions taken against them by Defendants sometime after October 4, 2022, after Stephen reached out to Mr. Hill to disclose that Lauletta no longer worked "with MassMutual" or for Skylight apparently.

84. Stephen, MassMutual, and Skylight could have taken this opportunity to address the bad acts taken by Lauletta and his team to convince the Hills to purchase and finance the policy, but instead, they continued the scheme against the Hills.

85. It is now clear that the policy will *never* be enough money to pay off the loan used to finance the Policy.

86. If Mr. Hill surrendered the Policy now, he would owe over $4,000,000. He would have to sell extensive portions of his assets to settle the debt, and even the selling of his assets may not be enough.

87. If Mr. Hill does not surrender the Policy now, his only other choice is to keep it afloat by continuing to finance the premiums and interest each year.

13

88. Each year he does this, the gap between the cash surrender value of the policy and the total loan amount owed gets *larger*, not smaller.

89. As a result of the Defendants' intentionally manipulative and deceptive scheme, Mr. Hill has no way out of the Policy and financing scheme other than death. Even then, after paying the balance of the loan from the Policy's death benefit, there will be very little (if any) Policy proceeds left over for distribution to the beneficiaries. So the only people or entities who will benefit from the Policy's existence are the premium financer, Lauletta and his team, Skylight, and MassMutual—not Plaintiffs

### III. CAUSES OF ACTION

### COUNT I: NEGLIGENCE (LAULETTA & STEPHEN)

90. The Hills adopt and fully incorporate the paragraphs above as set forth herein word for word.

91. Lauletta and Stephen owed certain duties to Plaintiffs, including but not limited to:

   a. Those provided by 15 U.S.C. § 80a-1 *et seq.*;

   b. Those provided by 15 U.S.C. § 80b-1 *et seq.*;

   c. Those provided by Arkansas Code Annotated § 23-42-101 *et seq.*;

   d. Those provided by the regulations of the Arkansas Securities Commissioner and the Arkansas Insurance Department;

   e. The duty to act in Plaintiffs' best interests;

   f. The duty to exercise the degree of skill and care ordinarily possessed and used by other investment advisers and insurance agents doing similar work.

92. Lauletta and Stephen breached each of these duties as explained herein.

93. Lauletta's and Stephen's breaches of these duties directly and proximately damaged

Plaintiffs in an amount to be determined at trial but in no event less than the amount required for federal diversity jurisdiction.

94. Additionally, Lauletta's and Stephen's negligence and liability may be imputed to Skylight and MMLI as he was acting in the scope of his employment and agency with the same.

### COUNT II: BREACH OF FIDUCIARY DUTIES (LAULETTA & STEPHEN)

95. The Hills adopt and fully incorporate the paragraphs above as set forth herein word for word.

96. A fiduciary relationship exists between an investment adviser and a client.

97. Lauletta and Stephen's owed certain fiduciary duties to Plaintiffs, including but not limited to:

   a. Those provided by 15 U.S.C. § 80a-1 *et seq.*;

   b. Those provided by 15 U.S.C. § 80b-1 *et seq.*;

   c. Those provided by Arkansas Code Annotated § 23-42-101 *et seq.*;

   d. Those provided by the regulations of the Arkansas Securities Commissioner and the Arkansas Insurance Department;

   e. The duty to act in Plaintiffs' best interests;

   f. The duty not to self-deal.

98. Lauletta and Stephen's breached each of these duties as explained herein.

99. Lauletta's and Stephen's breaches of these duties directly and proximately damaged Plaintiffs in an amount to be determined at trial but in no event less than the amount required for federal diversity jurisdiction.

100. Additionally, Lauletta's and Stephen's breach of duty and liability may be imputed to Skylight and MMLI as he was acting in the scope of his employment and agency with the same.

## COUNT III: CIVIL CONSPIRACY (ALL DEFENDANTS)

101. The Hills adopt and fully incorporate the paragraphs above as set forth herein word for word.

102. All Defendants entered into an agreement to accomplish a purpose that is unlawful or oppressive or to accomplish, by unlawful or oppressive means, a purpose that is not in itself unlawful or oppressive (the "Conspiracy").

103. As alleged above, each Defendant took at least one or more overt acts in furtherance of the Conspiracy.

104. MassMutual continued to write policies for Lauletta after learning about his deceptive sales tactics.

105. Defendants created a system whereby Lauletta, with the help of his team, working for Skylight and as an agent of MMLI, intentionally pitched premium-financed MassMutual policies that were not necessary or suitable for the financial planning needs of the people to whom the polices were pitched using deceptive tactics and false statements, which included the Hills.

106. Using this system, Lauletta and team advised the Hills to purchase the Policy, then advised them to finance it through Wintrust.

107. Also using this system, Lauletta and team advised the Hills, and their Trust, to personally guarantee the debt to Wintrust.

108. Lauletta and team advised Plaintiffs to do all these things despite the fact that the Policy was not necessary or suitable for the Hills' financial planning needs, and ultimately knowing that the Policy itself would put the Hills in a worse financial position than they were in at the time they purchased the Policy.

109. Lauletta and team advised the Hills to do so in furtherance of the conspiracy among

the Defendants and so that each of the Defendants would profit therefrom at the expense of the Hills.

110. As alleged in this Complaint, Defendants each committed one or more overt acts in furtherance of the Conspiracy, and they had the specific intent to harm Plaintiffs, and particularly Mr. Hill.

111. Further, following numerous complaints and inappropriate actions like those described herein taken by Lauletta against other Arkansans, Lauletta lost the ability to maintain his registration as a financial adviser in Arkansas in 2022. Instead of using this as an opportunity to address these bad policies written by Lauletta, Defendants allowed Lauletta's team, and particularly Stephen, to continue the scheme against unknowing victims, including the Hills, thus perpetuating and continuing the conspiracy.

112. As a result of the Conspiracy, Plaintiffs proximately have suffered damages in an amount to be determined at trial but in no event less than the amount required for federal diversity jurisdiction, litigation costs, and attorney's fees.

113. Additionally, Defendants knew or should have known that, in carrying out such Conspiracy, it would naturally and probably result in damage to Plaintiffs and/or in reckless disregard of the consequence to the extent that malice may be inferred from Defendants' conduct.

114. Therefore, in addition to all other damages to which Plaintiffs are entitled to recover from Defendants, Plaintiffs are entitled to recover punitive damages from Defendants in an amount to be established at trial but in no event less than the amount required for federal diversity jurisdiction.

### COUNT IV: NEGLIGENT HIRING AND SUPERVISION OF LAULETTA (SKYLIGHT, MMLI, & MASSMUTUAL)

115. The Hills adopt and fully incorporate the paragraphs above as set forth herein word

for word.

116. Lauletta was an employee or independent contractor of Skylight, MMLI, and MassMutual.

117. Lauletta was careless, reckless, and incompetent in the performance of his duties to the Hills on behalf of Skylight, MMLI, and MassMutual, as herinabove alleged.

118. Lauletta was also careless, reckless, and incompetent prior to his relationship with Skylight, MMLI, and MassMutual, as evidenced by the numerous complaints received from customers about Lauletta.

119. Skylight, MMLI, and MassMutual knew (or should have known) of Lauletta's carelessness, recklessness, and incompetence as evidenced by the heightened supervision measures they mandated as a condition of his employment. They certainly knew (or should have known) of the pending customer complaints. Skylight, MMLI, and MassMutual negligently selected and hired Lauletta anyway.

120. Skylight, MMLI, and MassMutual undertook to perform certain supervision efforts as evidenced by the heightened supervision measures they mandated as a condition of his employment.

121. Skylight, MMLI, and MassMutual negligently performed their supervisory duties; the best evidence of this is what is happening to the Hills, and what has happened to other MassMutual policy holders who bought their policy (and premium financed such purchase) on Lauletta's advice.

122. Skylight, MMLI, and MassMutual's negligent selection and supervision of Lauletta proximately caused the Hills' damages in an amount to be determined at trial but in no event less than the amount required for federal diversity jurisdiction, litigation costs, and attorneys' fees.

123. Plaintiffs request a jury trial on all issues so triable.

WHEREFORE, Plaintiffs pray for a judgment against Defendants jointly and severally for negligence, breach of fiduciary duty, conspiracy, negligent supervision, and negligent hiring, each in an amount to be assessed by a jury, but in no event less than the amount required for federal diversity jurisdiction, plus punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and any other relief to which they may be entitled.

Respectfully submitted,

Kael K. Bowling, Ark. Bar No. 2016220
Alexa R. Mizer, Ark. Bar No. 2022066
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, Arkansas 72758
Telephone: (479) 695-2118
Facsimile: (501) 244-5333
kbowling@fridayfirm.com
amizer@fridayfirm.com